Filed 10/28/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047281 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1896747) |
| v. | |
| SALISA CHEYENNE GREELEY, | **ORDER MODIFYING OPINION** |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 19, 2021 be modified as follows:

On page 20, first full paragraph, replace "court operations fee" with "criminal justice administration fee" so that the disposition reads as follows:

The probation order is reversed. On remand, the trial court is directed to amend the probation order to vacate the portion of the criminal justice administration fee and the probation supervision fee that remained unpaid as of July 1, 2021, and to reduce the term of probation to two years.

There is no change in judgment.

Dated:_____          _____
                                                                    ELIA, ACTING P.J.


_____          _____
        GROVER, J.                                             DANNER, J.

Trial Court:                                          Santa Clara County Superior Court
                                                      Superior Court No:  C1896747


Trial Judge:                                          Honorable Kenneth Paul Barnum



Counsel for Plaintiff and Respondent:                 Xavier Becerra
THE PEOPLE                                            Attorney General

                                                      Matthew Rodriguez
                                                      Acting Attorney General

                                                      Lance E. Winters
                                                      Chief Assistant Attorney General

                                                      Jeffrey M. Laurence
                                                      Senior Assistant Attorney General

                                                      Seth K. Schalit
                                                      Supervising Deputy Attorney General

                                                      Lisa H. Ashley-Ott
                                                      Deputy Attorney General

Counsel for Defendant and Appellant:                  Paul R. Kraus
SALISA CHEYENNE GREELEY                               By appointment of the Sixth District
                                                      Appellate Program

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SALISA CHEYENNE GREELEY,<br><br>    Defendant and Appellant. | H047281<br>(Santa Clara County<br>Super. Ct. No. C1896747) |

Defendant Salisa Cheyenne Greeley was convicted by jury trial of first degree burglary (Pen. Code, § 460, subd. (a)).[1]  The trial court suspended imposition of sentence, placed defendant on probation for three years, and imposed various fines and fees, and restitution.  On appeal, defendant argues:  (1) several instances of prosecutorial misconduct, individually and collectively, warrant reversal; (2) the trial court prejudicially erred by giving CALCRIM No. 315 [Eyewitness Identification]; (3) these errors cumulatively violated her due process rights; (4) the imposition of court assessments and a restitution fine without an ability-to-pay hearing violated her constitutional rights; (5) the three-year term of probation is now unauthorized; and (6) the court should strike the criminal justice administration fee and the probation supervision fee.  We reject defendant's first four claims, but agree that the term of probation should be reduced to two years and that the unpaid portions of the criminal justice administration and probation supervision fees should be stricken.  Accordingly, we reverse the judgment and remand with instructions.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I.    BACKGROUND

### A.    *The Prosecution's Case*

Just before midnight on July 26, 2018, Karl Day looked out his second floor apartment window and observed two men and a woman "acting suspiciously." Day observed one of the men looking through the window of another apartment, while the other man and woman acted as lookouts. Day thought that the woman "look[ed] Asian." Eventually, Day saw one of the men pushing against the window. After Day heard the window break, he called 911. One of the men then climbed into the apartment. After police responded, Day told an officer that he "would not be able to recognize the suspects if [he] saw them again" based on "[e]nvironmental factors," meaning "the short amount of time" that he saw them, "the lighting," and "the distance" involved.

Officer Hymel Dunn responded to Day's 911 call within minutes. As he arrived on the scene, his headlights illuminated a woman, who Dunn later identified as defendant, lying in a prone position underneath a truck, with a large bag within arm's reach. The location was about 75 to 100 yards from the apartment. Dunn ordered defendant to come out from the under the truck and arrested her. The bag contained items that had been taken from the apartment.

At trial, Day identified defendant in court as looking like the woman he saw standing lookout. He admitted, however, that at the preliminary hearing, he had stated he " 'couldn't be a hundred percent positive ' " that defendant was the person he had seen act as lookout. He testified at trial that the reason for his uncertainty at the preliminary hearing was because he "noticed [at the preliminary hearing] that [defendant] was not Asian," but rather "maybe Hispanic descent." He admitted that the revelation gave him pause, but reiterated that he was now "a hundred percent certain" that defendant, who he "originally thought was Asian," was the same woman he saw from his window.

On July 28, 2018, defendant made a recorded phone call from jail to a person named Jasmine. Excerpts from the call were played for the jury. Defendant told Jasmine

2

that she could have avoided arrest, but she got scared: "But you know, like we're not thinking, I'm not thinking, and I'm the one that fuckin' gets in trouble, like fuck. You know like out of all people, I'm the one that fuckin' gets in trouble again. Like you know how stupid I feel, fool, I coulda got away, but I got scared, like I feel like a bitch. Like I shoulda never fuckin' hid under that fuckin' car. What the fuck was I—" Defendant also explained that "we got snitched on," meaning "[s]omebody called saying that there was, there was 3 boys or something like that. They thought I was a boy." Defendant continued: "But I don't know, I don't know how serious this shit is, 'cause this shit could be hella serious, nigga, and they could be using these phone calls against me, like that's how serious it could be." Defendant concluded: "I don't give a fuck, 'cause I'm the only one in trouble. Fuck, I'm only get myself in more trouble."

### B.    The Defense Case

Dr. Kathy Pezdek testified as an expert on eyewitness memory identification. She explained the three-stage process of memory as it relates to reliability: (1) perception or observation; (2) storage; and (3) identification and testing. The first stage relates to "[h]ow clearly did the eyewitness see a particular perpetrator to begin with." The second stage involves "the ability to hold on to that information over time." The third stage involves looking at under what conditions an eyewitness made an identification. Dr. Pezdek also elaborated on nine factors that she thought should be considered in evaluating the reliability of eyewitness memory: lighting; distance; exposure time; presence of distractions; presence of disguise; the cross-racial effect; the passage of time between observation and identification; the possibility of clothing bias; and the testing of eyewitness memory.

Dr. Pezdek was asked a hypothetical that mirrored the circumstances of Day's identification of defendant. Dr. Pezdek opined that the hypothetical was "a textbook example of suggestibility and it would be ridiculous if that sequence ever actually got played out in a real case." She explained that "[w]hat matters is what an eyewitness

3

expressed as a level of certainty or confidence at their first opportunity to make an identification," and that subsequent expressions of confidence are less likely to reflect an accurate identification.

## II. DISCUSSION

### A. Prosecutorial Misconduct

Defendant argues that the prosecutor engaged in reversible misconduct during her direct examination of Officer Raymond McNair and during her cross-examination of Dr. Pezdek.

#### 1. Officer McNair

##### a. Background

Defendant moved in limine to exclude "evidence of any prior convictions, bad acts, arrests, and/or law enforcement contacts of [defendant]." The trial court denied that motion. Defendant also moved to exclude references to "Case No. C1770443," which was a "case where [defendant was] convicted of . . . two felonies and one misdemeanor . . . ." The court granted that motion.

Finally, defendant also moved to exclude statements she made to officers immediately following her arrest about her prior police contacts. The trial court granted the request with modifications. At the in limine hearing, defense counsel clarified that this request to exclude "is to the content within this five-page document, specifically when the officers—" The court then interjected: "[Defendant]'s statements recorded on a body camera. The officers tell each other [defendant] had been previously arrested, she has been previously to jail in Santa Clara County, and [defendant] answers affirmatively. [¶] So you're saying this encounter with the police officers with these specific questions is more prejudicial than probative?" Defense counsel answered, "Yes." The prosecutor indicated that she did not intend to put those statements into evidence, and the court then ruled that those statements "will be redacted." The parties then discussed the entirety of the body camera footage, and court ultimately decided that "anything that is post

4

*Miranda*, I'm going to grant" the motion to exclude. The court later elaborated: "From where the officers talked to [defendant], and from where the officers ask, 'Have you previously been to jail?' to her giving them her [personal file number], that's excised." The court explained that "[a]ll these statements are irrelevant, all these statements are highly prejudicial . . . ."

On cross-examination, defense counsel asked Officer McNair, who was present when Dunn arrested defendant, whether he was "able to determine [defendant's] race and ethnicity" when he first contacted her. McNair stated, "Not entirely." Defense counsel then asked if McNair had prepared a police report. McNair responded, "Yes." Defense counsel asked if he recalled defendant's "race or ethnicity being Hispanic?" McNair responded, "No." Defense counsel asked Officer McNair to refresh his recollection by reviewing part of the police report. After doing so, Officer McNair testified that the arrest report listed defendant's "race or ethnicity" as "Hispanic."

On redirect examination, the prosecutor asked if that type of "biographical information, is that something you get from the person that you arrest, in this case, the defendant self-reporting?" McNair replied, "That's one of the places we can get that." The prosecutor continued: "In this case, did you confirm defendant's race or ethnicity as Hispanic through any additional tests or additional ways?" McNair explained: "When you run a party out over the radio, your computer will come back, the various hits on various databases they're run through. DMV being one of them, CJIC being the other, which is the information system used by the corrections system in our county. And there was a CJIC hit on her name." Defense counsel interjected, "Your honor, I'm going to object to this answer based on—could we approach?" The court replied, "No." The prosecutor then offered to "rephrase it and cut to the chase," and proceeded to ask, "[w]ere you able to independently with just your own two eyes identify defendant as Hispanic or something else?" McNair replied, "No." The prosecutor continued, "You

5

had to either rely on information provided by her or some other information; is that fair?" Concluding his testimony, McNair said, "Yes."

Later, defense counsel argued that "it was highly improper" that McNair "commented about [defendant's] prior criminal history." Defense counsel asserted that it was "a violation of the court's order," and he "wonder[ed] if the [prosecutor] even admonished this witness not to talk about prior police contacts . . . ." The prosecutor responded that she had "absolutely admonished all the officers about [the] court's ruling in regards to . . . no mention of juvenile history, and no mention of criminal history in general. [¶] I did let the officers know that." The prosecutor explained that she had wanted McNair to testify whether it had been clear to him that defendant was Hispanic just by looking at her, and she had not anticipated that McNair would respond that he had found the information on CJIC.

The trial court ultimately decided to give the jury a curative instruction as to McNair's testimony: "Yesterday, Officer McNair testified about [defendant] and her connection with a database named or called CJIC. The court struck that testimony. The jury is instructed not to consider that portion of Officer McNair's testimony for any purpose whatsoever. Thank you."

### b. Analysis

Defendant argues that McNair's testimony—that he confirmed her race or ethnicity using CJIC—violated the court's in limine order to "exclude" defendant's statements to police " 'regarding prior police contacts because they are not relevant and highly prejudicial under Evidence Code section 352.' "

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew* (2003) 31 Cal.4th 822, 839.) "A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*Ibid.*)

6

Here, the prosecutor's conduct did not amount to misconduct because she did not elicit, nor attempt to elicit, evidence in violation of the court's in limine order. Rather, the prosecutor's questions were directed at Officer McNair's perception of defendant's race or ethnicity. The prosecutor's questions, and Officer McNair's response about the CJIC database, did not implicate any of the trial court's in limine orders. While the trial court granted defendant's motion to exclude statements made to police at the time of arrest, the prosecutor's question and Officer McNair's answer did not involve defendant's statements to police. Nor did the prosecutor's questioning amount to an attempt to elicit testimony about defendant's statements regarding her prior arrests to police officers. The line of questioning centered on how McNair determined that defendant was Hispanic, as indicated on the arrest report. It did not seek, explicitly or by implication, to delve into defendant's statements about her prior police contacts.

In addition, even assuming the conduct amounted to misconduct, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the prosecutor eliciting the challenged statements. "[W]e presume jurors are able to and do follow the court's limiting instructions." (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1171.) Here, the jurors were instructed to "not . . . consider that portion of Officer McNair's testimony for any purpose whatsoever." Accordingly, we presume that jurors ignored the challenged testimony. Thus, assuming misconduct, it was harmless under the applicable standard.

   2. *Dr. Pezdek*

    a. *Background*

The prosecutor moved in limine to limit the testimony of Dr. Pezdek. The prosecutor sought to exclude any testimony as to whether a witness made an accurate or inaccurate identification. The court granted the motion. During the in limine hearing, the parties discussed the scope of Dr. Pezdek's testimony and agreed that she would not be permitted to testify as to the reliability of another witness's identification. Defense

counsel stated that "Dr. Pezdek . . . can[not] comment on the credibility of another witness. [She] can only speak to facts in evidence . . . ." The prosecutor agreed that "her function is to educate the jury on different sorts of things that affect perception and ability to identify."

Defendant also moved to compel production of impeachment evidence, specifically, "any material to be used for impeachment against [defendant], if [s]he were to testify." The trial court granted the motion. At the in limine hearing, the topic of impeachment evidence was discussed in relation to Dr. Pezdek's anticipated testimony. The prosecutor indicated that she had "some transcripts from [Dr. Pezdek's] prior testimony," and if Dr. Pezdek testified inconsistently, she intended to "impeach her [with] those." The court asked the prosecutor, "have you discovered those transcripts to [defense counsel]?" The prosecutor said, "I have not." The court asked the prosecutor if she could do so today. The prosecutor stated that she had not finished reviewing the transcripts, and also that she felt she had no duty to give the transcripts to the defense. The court agreed with the prosecutor. The court also agreed with defense counsel that the prosecutor "would need to provide [defense counsel] a copy of that impeachment material at the time [the prosecutor] intends to impeach her."

During cross-examination, the prosecutor engaged in a line of questioning about Dr. Pezdek's testimony in other cases. The prosecutor then asked "[w]hen was the last time you testified in a criminal case prior to coming to court today?" Dr. Pezdek said "three times in the last month." The prosecutor continued: "Two weeks ago, approximately, you testified in another burglary case in Santa Clara County; is that right?" Dr. Pezdek answered, "Yes." The prosecutor then asked, "And it was a different defense attorney . . . not [defense counsel in this case]?" Dr. Pezdek replied, "Right." The prosecutor continued: "Would it surprise you to learn that the 12 jurors—," which prompted defense counsel to interrupt, "Objection. Improper." The court sustained the objection, and the prosecutor said, "I'll move on."

8

The prosecutor asked about the number of cases in which Dr. Pezdek had testified. The prosecutor noted that in 2010, Dr. Pezdek claimed to have testified "as an expert in excess of 300 times . . . ." Dr. Pezdek said, "That would sound likely." Defense counsel asked if she and the prosecutor could approach the bench, the trial court agreed, and an unreported discussion ensued. Questioning resumed, and the prosecutor asked, "Do you remember testifying in a case of People versus Cartlige and Duffy?" Defense counsel said, "Same objection. I have not received a copy." The court said, "I thought you were giving it to her." The prosecutor replied, "I am." Defense counsel was then given the document to inspect. The prosecutor asked again about the case, but Dr. Pezdek replied that she did not remember. The prosecutor offered to let Dr. Pezdek read the transcript to refresh her memory. The transcript was marked as exhibit 11, and given to Dr. Pezdek. The prosecutor then noted that Dr. Pezdek had claimed in her testimony today that she testified "give or take 18 times a year in the last ten years," in 2010 had claimed to have been an expert " 'in excess of 300 times,' " but in her testimony today had said she had testified as an expert "more than 350" times. The prosecutor then asked Dr. Pezdek to explain the discrepancy. Dr. Pezdek admitted that the number she provided today was "an estimate," and "[i]t would be more than that."

Later, out of the jury's presence, defense counsel raised concerns about the prosecutor's conduct with respect to the impeachment evidence. Defense counsel noted "it was only after I made a second objection that the court re-ordered [the prosecutor] to give me that document." The court asked defense counsel, "Have you had [an] adequate chance to review [it]?" Defense counsel stated, "Well, I don't have a copy of it right now." The court stated, "She gave it to you." Defense counsel responded, "She showed it to me and took it back." The court then noted, "The order was to give." The prosecutor explained that she understood the court's order to require her to show defense counsel a copy, which she did during the cross-examination. The court ordered the prosecutor to provide defense counsel with her own copy of the document.

9

Finally, at various points during the prosecutor's cross-examination of Dr. Pezdek, the prosecutor asked questions tending to highlight the fact that Dr. Pezdek was not opining as to the accuracy of Day's identification of defendant. In one instance, the prosecutor asked if Dr. Pezdek was aware of "any conditions in the area" that might affect the accuracy of an identification. Dr. Pezdek responded, "I can't—I'm not permitted to comment on anyway, that but no." The prosecutor also asked if Dr. Pezdek had gone to the scene, and she responded, "No" and "I can't comment on that." The prosecutor continued to point out in other instances that Dr. Pezdek was only speaking about the accuracy of eyewitness memory in general, and not specifically about the accuracy of the identification made in this case.

### b. Analysis

Defendant first argues that the prosecutor committed misconduct by cross-examining Dr. Pezdek as to a case in which she had previously given expert testimony. Defendant points to the prosecutor's question to Dr. Pezdek about having testified recently in another case, and the follow-up question, "Would it surprise you to learn that the 12 jurors–"

"It constitutes misconduct to examine a witness solely for the purpose of implying the truth of facts stated in the question rather than in the answer to be given, and a prosecutor should not pursue a line of questioning that is damaging but irrelevant." (*People v. Dykes* (2009) 46 Cal.4th 731, 766.) Here, it is a close question whether the prosecutor engaged in misconduct. The prosecutor arguably appeared to be attempting to suggest that 12 jurors had recently rejected Dr. Pezdek's testimony for the defense in another case. It is difficult to be certain, however, because the question was cut off before it was completed. If that was the purpose of the question, it was misconduct, because it was irrelevant but intended to be damaging to Dr. Pezdek's credibility.

However, we need not determine whether it was misconduct. Assuming it was, the prosecutor's question was harmless. In this case, defense counsel's objection was

10

sustained before the prosecutor even finished the question or Dr. Pezdek responded. As such, the jury only heard an incomplete question by the prosecutor. The potentially damaging assertion was never made. Further, the jury was given CALCRIM No. 222 [Evidence], which provides that "[n]othing that the attorneys say is evidence" and "[t]heir questions are not evidence." Thus, the jury was specifically instructed that the prosecutor's questions were not evidence and were "significant only if they helped you to understand the witnesses' answers." As we have discussed, we must assume that the jury followed the instruction and thus ignored the prosecutor's question. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 447.)

Defendant next points to the prosecutor's questions about Dr. Pezdek's inability to opine on the accuracy of the identification in this case. He argues that "[i]t cumulatively if not in any individual case violates the court's *in limine* orders admitting and limiting Dr. Pezdek's testimony." Not so. None of the questions asked Dr. Pezdek to comment on the accuracy of Day's identification, and none of the questions sought to expand her testimony beyond the permitted limits. Rather, the questioning highlighted that Dr. Pezdek was speaking only generally about the accuracy of eyewitness identification. In other words, the line of questioning only made clear the limits of Dr. Pezdek's testimony; it did not seek to expand her testimony beyond those limits.

Finally, defendant argues that the prosecutor committed misconduct by not providing defense counsel a copy of the document she used in her cross-examination of Dr. Pezdek until after Dr. Pezdek had completed her testimony. Defendant contends that the failure to do so violated the trial court's in limine orders. Here, there was no such violation. While the court granted defendant's motion for the production of impeachment evidence, it did so for such evidence as it related to defendant, not defendant's witnesses. Further, while there was an understanding reached at the in limine hearing that the prosecutor "would need to provide [defense counsel] a copy of [any] impeachment material [of Dr. Pezdek] at the time she intends to impeach her," the record reflects that

11

defense counsel *was* provided a copy of the impeachment document to inspect.  Although there was apparently some confusion as to whether the court's order required the prosecutor to provide defense counsel with her own copy *to keep*, the issue was remedied the same day, and defense counsel was provided with a copy to keep.[2]  We discern no error, let alone reversible error.

### B.      CALCRIM No. 315

Defendant argues that it was reversible error to give CALCRIM No. 315.  She points to the portion of the instruction that asks the jury to evaluate the identification testimony by considering, among other factors, "How certain was the witness when he or she made the identification?"  (Italics omitted.)  She contends that this "portion of th[e] instruction was error because it reinforces a common misconception that the certainty of an eyewitness identification correlates positively with its accuracy."  Thus, defendant contends the instruction violated her due process rights.

In *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), the defendant claimed the trial court erred when it instructed jurors pursuant to CALJIC No. 2.92 that they should consider " 'the extent to which the witness is either certain or uncertain of the identification' " because the language was at odds with "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy."  (*Sánchez*, *supra*, at p. 461, fn. omitted.)  The California Supreme Court determined the defendant's claim had been forfeited by his failure to request modification of the instruction in the trial court.  (*Id.* at pp. 461-462; see also *People v. Ward* (2005) 36 Cal.4th 186, 213 [finding no sua sponte duty to modify CALJIC No. 2.92].)  The *Sánchez* court also

_____

[2] Allowing defense counsel to inspect the document was also consistent with the Evidence Code, which requires, "[i]f a writing is shown to a witness, all parties . . . must be given an opportunity to *inspect* it . . . ."  (Evid. Code, § 768, subd. (b), italics added; see also Evid. Code, § 771, subds. (a) & (b) [if a witness uses a writing to refresh his or her memory, such writing must be produced at the request of the adverse party, and if produced, the adverse party may "inspect" the writing].)

determined that the defendant was not prejudiced by the instruction. (*Sánchez*, *supra*, at pp. 462-463.) The court observed that "[t]he instruction cited the certainty factor in a neutral manner, telling the jury only that it could consider it. It did not suggest that certainty equals accuracy." (*Id.* at p. 462.) "Moreover, the eyewitness identifications were far from the only evidence connecting [the] defendant to the crimes." (*Ibid.*)

After briefing was completed in this case, the Supreme Court issued its decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), which confirmed its previous holding in *Sánchez*. (*Id*. at p. 647.) In *Lemcke*, the defendant challenged CALCRIM No. 315, and its certainty factor, on due process grounds. Our high court rejected the defendant's due process claims. (*Lemcke*, *supra*, at pp. 655-661.) The court held, "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Id*. at p. 657.)

The Supreme Court acknowledged, however, that this version of CALCRIM No. 315 "has the potential to mislead jurors" given "the empirical research that ' "under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy." ' " (*Lemcke*, *supra*, 11 Cal.5th at p. 665.) Thus, while the defendant "failed to establish that the trial court's decision to include the certainty factor in CALCRIM No. 315 violated his due process rights or otherwise constituted error under the circumstances presented here," the court recognized the "risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy." (*Id*. at p. 669.) Thus, the

court directed "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Ibid.*)

Here, as in *Sánchez*, defendant forfeited any challenge to the trial court's eyewitness identification instruction by failing to object to the instruction or request its modification. (*Sánchez*, *supra*, 63 Cal.4th at pp. 461-462.) Further, even assuming the claim was cognizable in this appeal, defendant has also failed to establish that the inclusion of the certainty factor in CALCRIM No. 315 violated her due process rights or otherwise constituted error under the circumstances presented. The certainty factor was only presented as "one of 15 factors the jury should consider when evaluating an eyewitness identification," and its inclusion "did not render [defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Lemcke*, *supra*, 11 Cal.5th at p. 661.)

In sum, defendant has not established that the trial court committed reversible error by giving a version of CALCRIM No. 315 that included the certainty factor.

### C.     *Cumulative Error*

Defendant argues that the prosecutorial misconduct that she identified and the giving of CALCRIM No. 315, even if not individually prejudicial, combined to rise to the level of a due process violation. We disagree. We have rejected each of defendant's individual claims of error, except for two claims of prosecutorial misconduct where we found no prejudice even if error was assumed. Because there is no prejudice to cumulate, defendant's cumulative error challenge is unavailing. (*People v. Watkins* (2012) 55 Cal.4th 999, 1036.)

### D.     *Fines and Fees*

Defendant argues that imposition of court assessments and the restitution fine without an ability-to-pay hearing violated her state and federal constitutional rights. Defendant also argues that the criminal justice administration fee and probation

14

supervision fee are no longer authorized and should be stricken based on the passage of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869).  The Attorney General agrees that these two fees are no longer authorized, but contends that there is no need to strike them because "the fees automatically become uncollectable starting July 1, 2021, without the involvement of the courts."

### 1.    Background

Defendant was sentenced on May 10, 2019.  Immediately prior to her sentencing in the instant case, defendant pleaded no contest in an unrelated misdemeanor case (No. C1906555) to misdemeanor hit and run causing property damage (Veh. Code, § 20002, subd. (a)), misdemeanor flight from a pursuing officer (*Id*., § 2800.1, subd. (a)), and misdemeanor resisting, delaying, or obstructing a peace officer (§ 148, subd. (a)(1)).  Defense counsel, who represented defendant in both the misdemeanor case and this case, asked the court in the misdemeanor case to stay the fines and fees based on defendant's ability to pay.  A hearing was therefore held.

At that hearing, defense counsel represented that defendant was last employed in 2017.  Defendant stated that she planned to live at her father's house, likely would go to college, and had previously worked at Tesla and Goodwill.  She stated that she had reached out to Goodwill, and "they were willing to give me my job back as a customer associate." Defendant's father agreed that he would let defendant live with him.  The court asked defendant, "So you don't have any income right now, any monies you had would be from the generosity of your father?"  Defendant replied, "Yes."  The court determined that it would "stay the fines and fees" pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), but impose restitution of $1,000 for damage caused to another vehicle as a result of the hit-and-run offense.  Defense counsel stated that defendant's father "will cover the restitution for [defendant]."

The court then proceeded to sentencing in this case.  Relevant here, the trial court imposed a crime prevention fee of $10 and a penalty assessment of $31 (§ 1202.5), a

restitution fine of $300 and an additional restitution fine of $300 (§ 1202.44), a court security fee of $40, and a conviction assessment of $30. The court also imposed a criminal justice administration fee of $129.75 (Gov. Code, §§ 29550, former 29550.1, former 29550.2), and required defendant to pay probation supervision costs of $20 per month (§ 1203.1, subd. (b)). The court waived the presentence investigation fee of $450 at defense counsel's request.

### 2. Forfeiture

In *Dueñas*, the Second District Court of Appeal, Division Seven, reversed an order imposing the court operations assessment (§ 1465.8) and the court facilities assessment (Gov. Code, § 70373) after concluding that it was "fundamentally unfair" and violated due process under the federal and California Constitutions to impose the assessments without a determination of the defendant's ability to pay. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The court also concluded that the execution of a restitution fine under section 1202.4 "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, at p. 1164.)

Preliminarily, the Attorney General argues that defendant has forfeited her claim of error because her sentencing hearing took place on May 10, 2019, several months after *Dueñas* was decided. We agree. In general, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal. (*People v. Aguilar* (2015) 60 Cal.4th 862 , 864; *People v. Trujillo* (2015) 60 Cal.4th 850, 853-854.) At the time of defendant's sentencing hearing, *Dueñas* had already been decided, and there is no reason why defendant could not have requested an ability-to-pay hearing based on *Dueñas*. Indeed, immediately prior to the hearing in this case, defendant pleaded no contest and was sentenced in an unrelated misdemeanor case in which she requested and received an

ability-to-pay hearing based on *Dueñas*. Defendant's apparent decision to not raise the issue at the felony sentencing hearing forfeits her arguments on appeal.

Even if we were to find the issue preserved for review, we nonetheless would reject defendant's *Dueñas* claim on the merits because we remain convinced that *Dueñas* was wrongly decided for the reasons articulated in the dissent in *People v. Santos* (2019) 38 Cal.App.5th 923, 935-939 (dis. opn. of Elia, J.) and in the majority opinions in *People v. Adams* (2020) 44 Cal.App.5th 828, 832 and *People v. Petri* (2020) 45 Cal.App.5th 82, 90. Accordingly, even if we were to address the merits of defendant's claim, we would decline to remand for the trial court to hold an ability-to-pay hearing.

3.   *Assembly Bill 1869*

While the Attorney General agrees that the probation supervision fee and criminal justice administration fee imposed in this case are no longer authorized, he contends that the fees need not be stricken and the fees "automatically become uncollectable starting July 1, 2021, without the involvement of the courts." We disagree with the Attorney General's analysis and conclude that the plain language of Assembly Bill 1869 authorizes this court to strike the fees from the judgment.

On September 18, 2020, the Governor signed Assembly Bill 1869. Effective July 1, 2021, Assembly Bill 1869 "eliminate[d] the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and . . . eliminate[d] all outstanding debt incurred as a result of the imposition of [identified] administrative fees." (Stats. 2020, ch. 92, § 2.)

Specifically, Assembly Bill 1869 abrogated the authority to impose and collect 23 different administrative fees, including, as relevant here, the probation supervision fee and the criminal justice administration fee. It did so by adding section 1465.9 to the Penal Code, and section 6111 to the Government Code. (Stats. 2020, ch. 92, §§ 11, 62.) Relevant to the probation supervision fee, section 1465.9, subdivision (a) provides, "On and after July 1, 2021, the balance of any court-imposed costs pursuant to

17

[s]ection 987.4, subdivision (a) of [s]ection 987.5, [s]ections 987.8, 1203, 1203.1e, 1203.016, 1203.018, 1203.1b, 1208.2, 1210.15, 3010.8, 4024.2, and 6266, as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."[3]  (Stats. 2020, ch. 92, § 62.) Relevant to the criminal justice administration fee, Government Code section 6111 provides, "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to [Government Code] [s]ection 27712, subdivision (c) or (f) of [Government Code] [s]ection 29550, and [Government Code] [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."  (Stats. 2020, ch. 92, § 11.)

"We exercise de novo review when we engage in statutory construction."  (*People v. Brackins* (2019) 37 Cal.App.5th 56, 65.)  "Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' [Citation.]  'When the language of a statute is clear, we need go no further.' "  (*People v. Manzo* (2012) 53 Cal.4th 880, 885.)  "Absent any indicia of a contrary legislative intent, the word 'shall' is ordinarily construed as mandatory . . . .  [Citation]  This is especially so when both 'shall' and 'may' are used in the same statute."  (*People v. Hardacre* (2001) 90 Cal.App.4th 1392, 1398.)

In this case, we need not apply the presumption of retroactivity (see *In re Estrada* (1965) 63 Cal.2d 740), because by its plain terms the ameliorative changes of Assembly Bill 1869 apply retroactively to make any unpaid portion of the identified assessments, as they existed on June 30, 2021, "unenforceable and uncollectible" as of July 1, 2021. (Stats. 2020, ch. 92, §§ 11, 62.)  In addition to making any unpaid portion of the

---

[3] Section 1203.1b authorized imposition of the probation supervision fee.

identified assessments void by operation of law, however, the plain language of Government Code section 6111 and section 1465.9 not only authorizes, but mandates, vacation of a portion of a judgment for the purpose of striking the now-unauthorized assessments—here, the unpaid balance of the probation supervision and criminal justice administration fees. Specifically, after declaring that the identified fees are now "unenforceable and uncollectible," the relevant statutes then state, "*and* any portion of a judgment imposing those costs *shall be vacated.*" (Gov. Code, § 6111, subd. (a); § 1465.9, subd. (a), italics added.) Significantly, "[t]he Legislature also used the conjunctive 'and' which must be given effect under traditional statutory interpretation rules." (*In re Carr* (1998) 65 Cal.App.4th 1525, 1536.) Thus, although the unpaid balance of the identified fees is no longer enforceable and collectible, the statute *also* mandates that any portion of a judgment imposing those fees be vacated.[4] Accordingly, based on the plain language of the statute, the unpaid balance of the probation supervision and criminal justice administration fees must be vacated.[5]

### E. Maximum Term of Probation

Defendant contends that her probation term should be reduced to two years because a three-year term of probation is no longer authorized. The Attorney General agrees that defendant is entitled to a remand for a reduction of the probation term.

Assembly Bill No. 1950 (2019-2020 Reg. Sess.), which took effect on January 1, 2021 (Stats. 2020, ch. 328, § 2), amended section 1203.1 to limit to two years the length

---

[4] We note that Division One of the Fourth District Court of Appeal recently reached the same conclusion, concluding that "by its express terms, section 6111 envisions that the referenced costs are to be vacated, and it makes the vacatur mandatory through its use of the word 'shall.' " *(People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)

[5] This appeal involves a probation order, not a judgment. However, we construe the statutes to apply to probation orders. It is inconceivable that the Legislature's use of the word "judgment" was intended to preclude the statutes' application to a probation order.

of a probationary period for a felony conviction. (§ 1203.1.) We agree with the cases that have held that this amendment is retroactive to all nonfinal cases. (*People v. Sims* (2021) 59 Cal.App.5th 943; *People v. Quinn* (2021) 59 Cal.App.5th 874; *People v. Burton* (2020) 58 Cal.App.5th Supp. 1). Defendant's case is not yet final. Consequently, a remand is appropriate for the trial court to apply the amended statute.

## III.   DISPOSITION

The probation order is reversed. On remand, the trial court is directed to amend the probation order to vacate the portion of the court operations fee and the probation supervision fee that remained unpaid as of July 1, 2021, and to reduce the term of probation to two years.

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

GROVER, J.

_____

DANNER, J.

*People v. Greeley*
H047281

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No:  C1896747 |
| Trial Judge: | Honorable Kenneth Paul Barnum |
| Counsel for Plaintiff and Respondent:<br>THE PEOPLE | Xavier Becerra<br>Attorney General<br><br>Matthew Rodriguez<br>Acting Attorney General<br><br>Lance E. Winters<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Seth K. Schalit<br>Supervising Deputy Attorney General<br><br>Lisa H. Ashley-Ott<br>Deputy Attorney General |
| Counsel for Defendant and Appellant:<br>SALISA CHEYENNE GREELEY | Paul R. Kraus<br>By appointment of the Sixth District Appellate Program |